UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| MICHAEL HALLIWELL, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:13-CV-084 JD |
| NORTH WHITE SCHOOL CORPORATION, | ) |
| Defendant. | ) |

## **OPINION AND ORDER**

In this case Plaintiff Michael Halliwell (Halliwell) claims that Defendant North White School Corporation (the School) terminated him on the basis of his age in violation of the Age Discrimination in Employment Act (ADEA). Discovery has now closed in this matter and the School has filed a motion for summary judgment [DE 21] which is ripe for review.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). To survive a motion for summary judgment, the party with the burden of proof "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

1

**FACTS**

For the purposes of this motion for summary judgment, the Court will construe the evidence in the light most favorable to Halliwell. *See Anderson*, 477 U.S. at 255 (at the summary judgment stage the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

Michael Halliwell began teaching high school English at North White School Corporation in 2002. Several years later, in 2011, the Indiana General Assembly passed legislation that required the School to alter how it evaluated teachers. While teachers had been evaluated based on procedures and standards negotiated between the School and the teachers union, the legislative reforms required the School to independently devise an evaluation system that satisfied certain statutory criteria. The School developed such a system patterned off of an Indiana Department of Education exemplar. It required at least three classroom evaluations of each teacher per school year. The School began implementing it in 2011-2012 and it was fully implemented by 2012-2013.

Around this time—from 2010 continuing through 2014—the School offered older teachers an early retirement buyout consistent with the agreement of the teachers union. To be eligible for the buyout, a teacher had to have at least five years of experience at the School and be at least fifty years old. Halliwell was offered such a buyout on February 13, 2012, but elected not to accept it. In total, twenty-nine teachers were eligible for the 2012 buyout, nine of whom accepted it.

Halliwell was evaluated under the transition to the new evaluation system on February 27, 2012. While the School's principal typically conducted teacher evaluations, Curriculum Director Michelle Hay evaluated Halliwell. She also evaluated five other teachers, each over

forty years old.  Hay's evaluation concluded that Halliwell needed improvement, though also noted several areas where his performance was satisfactory.

In June 2012, Roderick McKee, at that time the School's principal, made a preliminary decision to terminate Halliwell, subject to confirmation by Nicholas Eccles, the School's superintendent, and the Board of School Trustees of the North White School Corporation (the School Board).  McKee based this decision on numerous asserted deficiencies in Halliwell's performance, including unprofessional behavior and a failure to rectify problems identified in the February 2012 evaluation (such as not teaching and assessing in conformity with state standards).  Halliwell then met with Eccles who decided against terminating him.  Eccles believed that Halliwell and McKee had a personality conflict, which would become unimportant since McKee planned to retire.

A new principal, Curtis Craig, then started the following school year (2012-2013).  He evaluated Halliwell several times throughout that year, noting both strengths and deficiencies in his performance.  In April 2013, Craig placed Halliwell on a teacher improvement plan.  That plan required Halliwell, among other things, to more comprehensively incorporate state standards into his teaching.  In May 2013, Craig found that Halliwell had failed to comply with a variety of the plan's provisions and made a preliminary decision to terminate him for insubordination, neglect of duty and other good or just cause under Indiana Code § 20-28-7.5-1.  Halliwell then met with Superintendent Eccles, who also determined there was sufficient evidence to terminate him.  The School Board held a hearing on June 28, 2013 where Craig, Eccles and Hay presented evidence in support of Halliwell's termination.  Two union representatives represented Halliwell and presented evidence in opposition.  The School Board voted 4-1 to terminate Halliwell for insubordination, neglect of duty and other good and just

cause.

Halliwell then filed this lawsuit. He contends that he was a victim of a scheme by the School administration to remove older teachers from the School. The School responds that Halliwell was fired for poor performance, not out of any discriminatory animus.

**ANALYSIS**

1. Motion to Strike

Prior to addressing the School's motion for summary judgment, it is necessary to resolve its motion to strike [DE 31]. That motion presents a "threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The decision to grant or deny a motion to strike is within the discretion of the trial court. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). The School argues that parts of Halliwell's affidavit and some of the exhibits that accompany it are inadmissible.

First, the School challenges Halliwell's 2007 and 2010 performance evaluations [DE 29-6 at 3-10] and the second and third paragraphs of his affidavit [DE 29-6 at 1] which refer to them. It argues that these evaluations preceded Halliwell's termination by two years and thus are not relevant to Halliwell's performance at the time he was terminated. Halliwell responds that they show that he performed well until he refused the School's retirement buyout offer, at which point the School abruptly altered its characterization of his performance. So, he says, they are relevant to the pretext inquiry.

The Court agrees. Evidence is relevant if "it has *any* tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401 (emphasis added). As

the Seventh Circuit has indicated, a "party faces a significant obstacle in arguing that evidence should be barred because it is not relevant, given that the Supreme Court has stated that there is a 'low threshold' for establishing that evidence is relevant." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012) (quoting *Tennard v. Dretke*, 542 U.S. 274, 285 (2004)).

In this case, there is a dispute as to the honesty of the School's proffered justification for terminating Halliwell. One way for Halliwell to demonstrate pretext would be to show that the School abruptly changed its characterization of his performance. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) (noting that inconsistencies or contradictions in an employer's rationale can demonstrate pretext); *Testerman v. EDS Tech. Products Corp.*, 98 F.3d 297, 305 (7th Cir. 1996) (discussing cases where an unprecedentedly unfavorable post-termination evaluation supported a finding of pretext). Halliwell's positive past performance evaluations could help show that (though as discussed below, their probative value is minimal and insufficient for Halliwell to survive summary judgment), which is all that is necessary to meet the minimal hurdle imposed by Rule 402. Accordingly, the Court denies the School's motion to strike as to Halliwell's 2007 and 2010 performance evaluations [DE 29-6 at 3-10] and the second and third paragraphs of his affidavit [DE 29-6 at 1].

Next, the School seeks to strike a student gradebook entry from fall 2013 [DE 29-6 at 11-15] and the fourth paragraph of Halliwell's affidavit [DE 29-6 at 1] which references it. The School contends that the gradebook is irrelevant since it postdates Halliwell's termination. Halliwell responds that it shows how the School subjected him to harsher standards than other teachers. He notes that the gradebook does not contain references to state standards, which he believes demonstrates that the School did not require teachers other than him to provide state standards with student grades.

5

The Court finds that the gradebook is not relevant. Information from fall 2013 does not shed any light on the School's expectations of Halliwell "at the time of [his] termination" several months earlier. *Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 329 (7th Cir. 2002). Moreover, even if the gradebook were from a time immediately before Halliwell's termination, it is a *student* grade printout. Halliwell has provided no evidence that such a document would typically contain the grade information the School requires *teachers* to provide. As such, the student gradebook entry is not even minimally probative of any fact of consequence in this action. The Court thus strikes it [DE 29-6 at 11-15] and the corresponding fourth paragraph of Halliwell's affidavit [DE 29-6 at 1] pursuant to Rule 402. Given this conclusion, the Court need not resolve the Defendant's inadmissibility arguments under Rules 801, 802, 601 and 901.

Finally, the School seeks to strike the seventh paragraph of Halliwell's affidavit [DE 29-6 at 2]. Therein, Halliwell asserts that he spoke with several teachers at the School who informed him that the School did not require them to incorporate state standard assessments in their grade submissions. The School contends that this is hearsay. Halliwell responds that these statements were made by employees of the School within the scope of their employment and are thus admissible under Rule 801(d)(2)(D).

The Court agrees with Halliwell. Out of court statements are not hearsay if they are offered against an opposing party and were made by the party's agent or employee on a matter within the scope of that relationship and while it existed. Fed. Rule Evid. 801(d)(2)(D). Those requirements are satisfied here. In his affidavit, Halliwell says he spoke with his fellow teachers, which would have been School employees. Further, he said that he spoke with them about the School's expectations of them. Employees' descriptions of their work duties fall squarely within the scope of their employment. *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th

6

Cir. 2003) ("[t]he only requirement [of 801(d)(2)(D)] is that the subject matter of the admission match the subject matter of the employee's job description").[1] As such, the Court finds that paragraph seven of Halliwell's affidavit [DE 29-6 at 2] is non-hearsay per 801(d)(2)(D) and denies the corresponding section of the School's motion to strike.

In sum, the Court grants the Defendant's motion to strike with regard to the fourth paragraph of Halliwell's affidavit [DE 29-6 at 1] and the student gradebook [DE 29-6 at 11-15]. The Court denies the Defendant's motion to strike with regard to the second, third and seventh paragraphs of Halliwell's affidavit [DE 29-6 at 1-2] and his 2007 and 2010 performance evaluations [DE 29-6 at 3-10].

2. ADEA Termination Claim

Halliwell claims that the School terminated him in violation of the Age Discrimination in Employment Act (ADEA). The ADEA makes it illegal, among other things, for an employer to discharge an individual over 40 years old on account of his or her age. *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir. 2010). To establish a violation of the ADEA, an employee must show that age "played a role in the employer's decision-making process and had a determinative influence on the outcome." *Id*. An employee can do this via a direct or indirect method of proof. *Id*. In this case, Halliwell is proceeding via an indirect method of proof. That requires him to establish that: (1) he was in the protected group of persons forty and older, (2) he was meeting his employer's legitimate expectations, (3) he suffered an adverse employment action and (4) similarly situated employees outside of the protected class were treated more

---

[1] In employment discrimination cases, the Seventh Circuit has held that a declarant must be involved in the decision-making process affecting the employment action at issue for his statements to be made within the scope of employment. *See, e.g.*, *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950-51 (7th Cir. 1998). But that restriction is only apposite where "the admission deals with hiring/firing/promoting/demoting-type decisions." *Aliotta*, 315 F.3d at 762. It does not apply here, where Halliwell seeks only to introduce his co-teachers' assessments of their duties.

7

favorably. *Widmar*, 772 F.3d at 463. If Halliwell succeeds in establishing this *prima facie* case, the burden shifts to the School to provide a legitimate, nondiscriminatory reason for terminating him. *Id.* Halliwell can then avoid summary judgment with evidence that the School's stated reason was pretextual. *Id.*

The parties do not dispute that Halliwell is a member of a protected class (he was 54) and that he was terminated. The only issues presented by this motion for summary judgment are whether Halliwell was performing well enough to meet the School's legitimate expectations, whether substantially younger employees were treated more favorably than he was and whether the School's justification for terminating him was pretextual.

### A. *Legitimate Employment Expectations*

To prevail in an ADEA claim, a Plaintiff must present evidence that he was meeting his employer's legitimate employment expectations. *Ho v. Abbott Labs., Inc.*, 618 F. App'x 852, 855 (7th Cir. 2015). The School first asserts that Halliwell was not meeting its legitimate expectations because he failed to adequately teach state standards. It provides substantial evidence to this effect. Craig testified that, based on his classroom observations, it did not seem to him that Halliwell was adequately teaching objectives set forth in the state standards. [DE 27-15 at 8]. Craig also sent Halliwell letters outlining in detail how he believed Halliwell had not met the requirements of the Teacher Improvement Plan, largely because Halliwell had not adequately planned, taught or evaluated students in line with state standards. [DE 27-19]; [DE 27-20]. Ultimately, Craig recommended that Halliwell be terminated because, among other things, there was "little evidence that Mr. Halliwell [had] taught the Indiana Common Core standards." [DE 27-21 at 5]. After deciding to terminate Halliwell, the School Board found that Halliwell's "failure to incorporate state standards in his lessons and assessments" amounted to

8

"neglect of duty" and that Halliwell had demonstrated insubordination in his "open resistance to efforts to persuade him to incorporate state standards into his teaching (planning, curriculum, and grade books)[.]" [DE 27-4 at 7].

But Halliwell provides evidence to the contrary. First, there are the School's Indiana End of Course Assessment (ECA) test results.[2] These indicate that 47.10% of sophomores passed the English 10 ECA in 2010-2011, before Halliwell began teaching it. After Halliwell began teaching it in 2011-2012, the pass rate jumped markedly to 71.00%. It then remained relatively high at 65.60% in 2012-2013. [DE 29-4]. Second, Principal Craig testified that he knew Halliwell had a dry erase board in his classroom on which he listed his classes and the state standard numbers that corresponded to those classes. [DE 27-15 at 11]. Third, Principal Craig testified that he observed a class in which Halliwell taught a poem which Craig agreed could conform with state standards. [DE 27-15 at 14]. Fourth, Ms. Hay testified that she observed Halliwell teaching a lesson that aligned with state standards. [DE 27-1 at 8].

The School disagrees that the evidence presented by Halliwell indicates that he adequately incorporated state standards into his teaching. It notes that high ECA scores alone do not indicate that a teacher is adequately teaching state standards. Nor does listing state standard numbers on a dry erase board show that Halliwell actually taught them. And while Halliwell was teaching a poem which could have been compatible with a state standards lesson, that does not mean Craig was actually teaching one.

All of these are plausible arguments. Along with the School's evidence, they might well lead a reasonable juror to conclude that Halliwell was not effectively teaching state standards.

---

[2] The School downplays the import of this jump in test scores and notes that in 2011-2012, when scores were the highest, another teacher assisted in Halliwell's classroom. Nevertheless, a reasonable juror could conclude that Halliwell contributed significantly to those scores, particularly because passage rates remained relatively consistent when Halliwell taught alone in 2012-2013.

9

At this stage, however, Halliwell "bears a burden only of producing some evidence" to support his position. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 743 (7th Cir. 1999).[3] In coming forward with (among other things) evidence that his students received high scores on state standardized tests, he has done that. Accordingly, there is a fact issue as to whether his instruction of state standards was adequate.

But while the evidence could support a finding that Halliwell met the School's legitimate expectations with regard to teaching ability, the same is not true with regard to his conduct. That is important, because the analysis of an employer's legitimate expectations does not merely consider a plaintiff's actual job performance; it also extends to factors such as insubordination and workplace camaraderie. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014). "The Seventh Circuit has affirmed numerous times that a demonstrated history of disrespectful and abrasive communications generally defeats an employee's efforts to demonstrate that [he] was meeting [his] employer's legitimate expectations." *Carragher v. Indiana Toll Rd. Concession Co.*, 936 F. Supp. 2d 981, 989 (N.D. Ind. 2013) (citing *Fane v. Locke Reynolds, LLP*, 480 F.3d 534 (7th Cir. 2007); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004)); *see also Hill v. Johnson*, No. 11 C 2144, 2012 WL 4483442, at *7 (N.D. Ill. Sept. 27, 2012) (an "employee who is recognized for performing some aspects of his job well but is confrontational and disrespectful toward others is not meeting his employer's legitimate expectations."). Further, an employee does not meet his employer's expectations where he fails to comply with his employer's reasonable directives. *Kephart v. Inst. of Gas*

---

[3] The Court will draw upon precedent from other antidiscrimination statutes to guide its interpretation of the ADEA, since the ADEA, Title VII and § 1981 share "essentially the same analytical framework." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 n. 4 (7th Cir. 2003).

*Tech.*, 630 F.2d 1217, 1223 (7th Cir. 1980); *see also Widmar*, 772 F.3d at 466 ("An employer can micro-manage and require as much petty communication as it wishes. And it may legitimately discipline an employee who fails to conform to the requirement so long as the discipline is not used as pretext for discrimination.")

The School presents substantial, uncontested evidence that Halliwell was not meeting its legitimate expectations with regard to his behavior.[4] In a June 2012 letter recommending Halliwell's termination, McKee noted (among other things) that Halliwell (1) made negative comments in the teacher lunch room, which caused several staff members to avoid eating there; (2) was "often short and sarcastic to students and colleagues" and (3) "[f]ailed to stop interrupting during a parent conference" even after the administration told him to stop. [DE 27-7 at 1-2].

Moreover, the evidence demonstrates that these behavioral issues continued unabated until Halliwell's termination. For example, in November 2012, Halliwell arrived at a lesson planning meeting with Craig without bringing class planning materials that Craig had requested. Halliwell informed Craig that he did not bring those materials and that he did not believe in

---

[4] Halliwell makes a cursory argument that the School could not terminate him for being "openly resistant and defiant" to state standards and "getting other teachers involved in resisting the state standards" consistent with the First Amendment. [DE 28 at 21]. But he does not bring a First Amendment retaliation claim. Moreover, he fails to explain how his statements were not made pursuant to his official duties, which is a necessary prerequisite to First Amendment protection. *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016); *see also Diadenko v. Folino*, 890 F. Supp. 2d 975, 987 (N.D. Ill. 2012) *aff'd*, 741 F.3d 751 (7th Cir. 2013) (finding that a teacher spoke as an employee, not a citizen, where he made a statement at a staff meeting that the school was using outdated standardized tests); *Hesse v. Bd. of Educ. of Twp. High Sch. Dist. No. 211, Cook Cty., Ill.*, 848 F.2d 748, 752 (7th Cir. 1988) ("[The Plaintiff] was not attempting to speak out as a citizen concerned with the problems facing the school district, but was instead attempting to articulate his own private disagreement with policies and procedures which he had either failed to apply or refused to follow.").

them. He further explained that he thought his current teaching style was effective. [DE 27-22 at 2]. In April 2013, Halliwell told Craig "[o]ne of the items listed on your improvement plan was supposed to start today. I am sorry but I will not be implementing that until I have discussed it with [union representative] Terri [sic] Brown and checked into the validity of that improvement suggestion and your entire evaluation." [DE 27-22 at 3]. Also in April 2013, Halliwell responded "why should I?" to directions he received from Craig. [DE 27-4 at 6]. Finally, in May 2013, Halliwell indicated that "defensiveness and resistance to change" correctly reflected his position regarding the administration's request that he more comprehensively incorporate state standards into his teaching. [DE 27-22 at 4].[5]

Halliwell does not specifically contest this evidence. He states in an affidavit that he "complied with state law and the reasonable rules for the governance of the school" and "was not openly resistant or defiant to any member of the School administration." [DE 29-6 at 2]. Such conclusory statements, however, are insufficient to create a fact issue. *See Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir. 1996) ("conclusory statements in the plaintiff's affidavit or deposition do not create an issue of fact") (alterations omitted); *Widmar*, 772 F.3d at 460 n. 1 (noting that a party's own affidavit can defeat summary judgment if it meets usual evidentiary requirements including that it *set forth specific facts* showing that there is a genuine issue for trial).

Halliwell also points to indications that he performed well, such as a February 2013 evaluation, which found him to provide effective instruction and leadership in the classroom,

---

[5] The School also says that Halliwell had a "low opinion" of the School's students. That appears to be drawn from Halliwell's observation in a memorandum to Craig that many of his students "struggle to read at grade level." [DE 27-21 at 3]. But, as Halliwell testified, that remark could reasonably be understood to be a reference to the challenges posed by the School's indigent and English-as-a-second-language populations rather than an inappropriate slight. [DE 27-2 at 22-23]. Additionally, the School claims Halliwell engaged in efforts to get other teachers involved in resisting state standards, though provides no information as to how he purportedly did so. [DE 26 at 8].

although it does not mention state standards [DE 27-11], and an April 2013 evaluation that, taken in a light most favorable to Halliwell, could indicate that he was teaching satisfactorily. [DE 27-13]. He also notes that his Academic Super Bowl team won state around late 2012 and that his Battle of the Books team performed well. [DE 27-2 at 21].

But this is simply evidence that Halliwell taught well, not that he was meeting the School's expectations regarding his comportment. *See Fane*, 480 F.3d at 540 ("The fact that Fane completed her assignments has no bearing on whether she met [her employer's] expectations regarding employee conduct."). Halliwell cannot be said to have lived up to those expectations given his strident communications with Craig, refusal to comply with administration directives and agreement that he was defensive and resistant to change. *See id.* (holding that an employee failed to satisfy her employer's legitimate expectations where she inappropriately addressed her supervisor and communicated abrasively with clients and colleagues). Accordingly, Halliwell has not presented sufficient evidence to permit a finding that he met his employer's legitimate employment expectations.[6]

### B. *Legitimate, Nondiscriminatory Reason*

Halliwell's failure to raise a fact issue as to the second element of his *prima facie* case precludes his recovery. But even if Halliwell had met his burden of proof and established a *prima facie* case of discrimination, his claim would not survive the next part of the analysis. If he had established a *prima facie* case, the burden would shift back to the School to articulate a

---

[6] Halliwell's failure to demonstrate a genuine issue of material fact as to the second element of his claim also precludes him from satisfying the fourth element of his claim. He contends that he need only show that "was replaced by someone substantially younger." *Perry v. Bath & Body Works, LLC*, 993 F. Supp. 2d 883, 916 (N.D. Ind. 2014). But that standard is not applicable here. The Seventh Circuit has explained that an employee only has to show that he was replaced by someone substantially younger *if* he can show that he was meeting his employer's legitimate employment expectations. *Naik v. Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010). Because Halliwell has not made that showing, he must present evidence that similarly situated, substantially younger employees were treated more favorably than he was. *See id*. He has presented no evidence to that effect.

legitimate, nondiscriminatory reason for his termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). This is merely a burden of production, which "is not difficult to satisfy[.]" *Mills*, 83 F.3d at 845. As discussed in detail above, the School does articulate legitimate and nondiscriminatory reasons for termination. *See* [DE 27-4 at 7] (noting as reasons for termination Halliwell's purported failure to adequately incorporate state standards into his teaching, willful refusal to do so and openly resistant and defiant attitude).

   *C. Pretext*

That switches the onus to Halliwell to prove that the School's justification for firing him was a lie. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

In an effort to establish the insincerity of the School's rationale for terminating him, Halliwell points to the retirement buyout program that the School offered teachers in February 2012. Around that time, Hay—who did not typically conduct performance evaluations—observed six teachers. Five of them were eligible for the buyout and all were above forty. So, Halliwell says, the School made the buyout available and then used Hay to pressure older teachers into taking it.

But that is not a rational inference from the evidence presented. It is well-established that retirement buyout programs are not in and of themselves suspicious or discriminatory. *Cerutti*, 349 F.3d at 1062. On the contrary, they typically represent a benefit to their recipients. *Id*. So, Halliwell is left to establish pretext by pointing to Hay's evaluations of protected class members, which he cannot do. Hay testified that McKee was having difficulty evaluating all of the School's teachers by himself, and so McKee and Eccles asked Hay to assist. [DE 27-1 at 5-6].

Hay then evaluated six individuals, all over age forty (as over 75% of the School's high school teachers were). Of the teachers she evaluated other than Halliwell, she found three to be performing satisfactorily and two in need of improvement. [DE 27-1 at 11]. That is simply not indicative of a concerted campaign to drive older teachers from the School. *See Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 643 (7th Cir. 2008) ("A pattern where the protected-class members sometimes do better and sometimes do worse than their comparators is not evidence of age discrimination.") (internal quotation marks omitted).

Halliwell also contends that the School referred to him with discriminatory "code words." These include references to Halliwell's use of a dot-matrix printer (to describe old lesson plans), his "lack of effort to keep current," his "defensiveness and resistance to change" and his engaging in a "traditional form of instructional delivery" as a "disseminator of knowledge." [DE 28 at 10, 13]. These phrases are not discriminatory, however, because they criticize Halliwell's performance rather than his age. *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 672 (7th Cir. 1998) ("To evaluate an individual worker or a group of workers as lacking energy, initiative, commitment, imagination, flexibility, or other desired characteristics is not to indulge in age stereotypes, and is indeed the kind of evaluative approach that the antidiscrimination laws seek to encourage."). If anything it is prejudicial to assume that descriptors such as "lack of effort to keep current" categorically apply to the older population. *See id.* at 671.

Next, Halliwell says that, unlike other teachers, the School required him to provide references to state standards with his grades. In support of this assertion, he testifies that he "discussed with several other teachers whether the North White School Corp. administration was forcing them to reflect assessment of state standards in their grades, and every teacher to whom [he] spoke indicated that no such requirement was forced upon them." [DE 29-6 at 2]. Evidence

15

that an employer applied its expectations in a disparate manner can indeed support a finding of pretext. *Peele,* 288 F.3d at 329. But the information Halliwell provides is far too vague to be significantly probative. He does not indicate which teachers he spoke to or how they were similarly situated to him. Nor can the Court fill in those gaps with speculation or conjecture. *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013). Without that information, there is no reason to conclude that the School's expectations of other teachers are in any way relevant to its expectations of Halliwell and there is no basis for a finding of pretext. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (noting that it is necessary to eliminate variables such as differing roles, performance histories and decision-making personnel to draw an inference of discrimination from the differential treatment of employees).

Halliwell further points to his 2007 and 2010 performance evaluations. He says that these demonstrate that he was favorably reviewed before the School's retirement buyout, at which point "suddenly [he] was less favorably reviewed." [DE 32 at 1]. An abrupt about-face of an employer's evaluation of an employee could be evidence of pretext. *See Widmar*, 772 F.3d at 465. But the performance evaluations at issue here predated the School's buyout offer by at least two years. As such, they cannot demonstrate the sort of sudden change in position that might be indicative of duplicity. Moreover, the School's adoption of a modified teacher evaluation system in 2011—which Halliwell testified changed performance expectations of teachers, [DE 27-2 at 8]—further undercuts any comparative value of his past evaluations.[7] *See Peele*, 288 F.3d at 329 (noting the minimal relevance of a plaintiff's performance evaluations from a position she had

---

[7] Halliwell asserts that "Defendant's Curriculum Director Michelle Hay stated that the RISE model is an evaluation model, and did not identify it as a changed expectation." [DE 32 at 1]. Hay did not, however, testify that the new evaluation system did not alter teacher expectations. The portion of her testimony that Halliwell references says only: "Q. What is RISE? A. RISE is the State-adopted evaluation model for evaluating the teachers." [DE 27-1 at 12].

16

held previously since that position differed significantly from the position she held at the time of termination).

That leaves Halliwell's argument that one of the school's primary rationales for terminating him—his failure to adequately teach state standards—was pretextual because it was not true.[8] But it is not enough for Halliwell to argue that his termination was not warranted; he must present evidence that the School's reasons for terminating him were insincere. *See Atanus v. Perry*, 520 F.3d 662, 674 (7th Cir. 2008). To this end, he says Craig *knew* he was adequately teaching state standards since Craig was aware of Halliwell's practice of listing state standards on his white board and Halliwell's high test scores. Furthermore, Craig observed Halliwell teaching a poem, which could have been consistent with state standard instruction, and reviewed lesson plans that Halliwell submitted, which contained references to state standards.

But simply showing that Craig could have reasonably reached a different conclusion than he did does not show that he was lying. Rather Halliwell must show that Craig's position was "so unreasonable as to create the inference that" it was dishonest. *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1013 (7th Cir. 2004). On that score he falls short. The record indicates that Craig reasonably concluded (rightly or wrongly) that Halliwell was not adequately teaching state standards. Indeed, Craig's letters to Halliwell articulated the basis for his belief that Halliwell was not adequately teaching state standards in detail. *See, e.g.*, [DE 27-17 at 2] (noting concerns that Halliwell was not adequately teaching standard 2 (nonfiction reading) and standard

---

[8] Halliwell also makes two other unpersuasive arguments as to pretext, which merit only brief discussion. First, he attempts to derive ill intent from his performance evaluations, which he asserts contain directly contradictory observations. They do not. For example, contrary to Halliwell's assertions, one could reasonably find that a classroom ought to be more "stimulating and interesting" despite its being clutter free and containing literary posters. [DE 27-6 at 1-2]. Second, Halliwell asserts that his teacher improvement plan was a predetermined ruse because Craig informed Halliwell that he was not in compliance with it twice before it ended. But if anything it would seem that informing Halliwell of his noncompliance with the plan provided him with an opportunity to rectify his performance before the plan ended. Moreover, Craig's detailed explanation as to why Halliwell failed to comply with the terms of the plan undermines the conclusion that it was predetermined. [DE 27-21].

17

5 (writing a research report); [DE 27-19 at 1] (finding that questions on Halliwell's quizzes were not sufficiently difficult and his lesson plans were underdeveloped). Further, it is hard to make a case that Craig's assessment of Halliwell was unfounded when the principal before him had reached similar conclusions, [DE 27-7 at 2-3], and so did the School Board. [DE 27-4].

Nor does Halliwell's evidence undercut the reasonableness of Craig's assessment of him. Halliwell's instruction on a poem potentially consistent with state standards, his practice of listing state standard numbers on his white board, the high test scores his students received and his lesson plans, which contained state standard references, do not compel the conclusion that his instruction was adequate. Collectively, this could support an inference that Halliwell's instruction was satisfactory, but it does not render Craig's finding to the contrary beyond reason. As such, it is not evidence of pretext.[9] *See Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 516 (7th Cir. 1999) (noting that an employer's assessment of an employee's conduct, well potentially wrong, was not unsupported and thus not susceptible to a finding of pretext).

Two additional factors further render any finding of pretext unreasonable. First, it does not appear that the School targeted older teachers for performance issues or termination. Nine teachers were rated as "needs improvement" or "ineffective" during the 2012-2013 school year: five under forty and four over forty. [DE 27-30 at 2]. Furthermore, Craig only recommended two teachers other than Halliwell for termination between 2011 and 2013, both in their twenties. [DE 27-15 at 4]; [DE 30-2 at 1]. While this is not dispositive, it is nevertheless "hard to make out a case for age discrimination when younger workers are also being shown the door." *Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 454 (7th Cir. 2009). Second, while

---

[9] Even if it were, Halliwell still could not survive summary judgment, since that would show only that Craig's assessment of Halliwell's performance (and not his conduct) was pretextual. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 403-04 (7th Cir. 2008) (noting that, where a defendant has offered multiple reasons for its hiring decision, it is generally insufficient to withstand summary judgment to show that only one of them is pretextual).

McKee recommended Halliwell for termination in early 2012, the School did not terminate Halliwell. Instead, Eccles recognized that Halliwell and McKee may have had a personality conflict and elected to give Halliwell an opportunity to work with Craig, the School's new principal. It was only after Craig too recommended Halliwell's termination that Eccles elected to move forward with it. While giving an employee a second chance does not preclude a finding of discrimination, it does tend to show that the School was sincere in its efforts to work with Halliwell and in its ultimate decision to terminate him for performance deficiencies. Accordingly, Halliwell has failed to show that the School's justification for terminating him was pretextual.

**CONCLUSION**

Consistent with the discussion above, the Court GRANTS IN PART the School's motion to strike [DE 31], but otherwise denies it. The Court further GRANTS the School's motion for summary judgment [DE 21] and DIRECTS the clerk to enter judgment for North White School Corporation against Michael Halliwell.[10]  SO ORDERED.

SO ORDERED.

ENTERED: March 1, 2016

                                               /s/ JON E. DEGUILIO

                                               Judge
                                               United States District Court

---

[10] Since the Court finds no evidence of prohibited animus, it need not address the Defendant's argument that the School Board's hearing cleansed any animus the School administration may have had.